# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR424-066 |
| | ) | |
| DARRELL DEMARCUS GOLDEN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND REPORT AND RECOMMENDATION

Defendant Darrell Demarcus Golden is charged with a single count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g). Doc. 1. He has moved to suppress evidence seized when he was arrested, doc. 24, for a determination that statements he made to law enforcement officers were involuntary, doc. 23, and to preclude the Government from introducing evidence of his uncharged conduct, pursuant to Federal Rule of Evidence 404(b), *see* doc. 27. On October 8, 2024, the Court held a hearing on the motions. Doc. 35 (Minute Entry). The Court did not take any of the motions under advisement at that time, but ordered the parties to submit additional briefing clarifying their respective positions. *See id.* The parties complied with that direction. *See* docs. 36, 39, 40, 41, 42 & 43. On

1

December 10, 2024, the Court held a second hearing. Doc. 46. At that hearing, both parties agreed that the motions were ripe for disposition.

The events leading to Golden's arrest and prosecution in this case began on July 27, 2023 when Savannah Police officers responded to a report of an individual attempting to pass counterfeit currency.[1] Video recorded by Officer Samuel Johnson's body-worn camera ("BWC") shows that officers arrived at the reporting location, Officer Johnson asks "Where's he at?," and an unidentified individual responds, "He's the guy outside with the black bucket hat." Without any further interaction, Johnson exits and confronts an individual in a black bucket hat, subsequently identified as Defendant. The video shows that officers tell Defendant to stop and the two officers take hold of his hands. While the officers are apparently attempting to secure Defendant's hands in handcuffs, he pulls away from them and attempts to flee. The video from Johnson's BWC shows the other officer wrestle Defendant to the ground and place him in handcuffs. The officers then escort Defendant

---

[1] Savannah Police Officer Samuel Johnson testified at the October 8 hearing. *See, e.g.,* doc. 35. Multiple video recordings from Johnson and other officers' body-worn cameras were admitted. *See* doc. 35-1 at 1. This summary of the factual background of this case is drawn from that testimony and the admitted videos. Any fact relied upon in disposing of Defendants' motions is cited specifically in those analyses below.

to their vehicle and secure him in the back seat.  As discussed in more detail below, officers subsequently discovered a firearm in a bag Golden was carrying before he was arrested.  *See, e.g.,* doc. 39 at 2.

## I.    SUPPRESSION OF PHYSICAL EVIDENCE (Doc. 24)

Golden seeks to suppress physical evidence discovered as a result of his arrest.  *See* doc. 24.  He first asserts that his initial interaction with the officers, when they told him to stop and physically restrained him, constituted an investigative stop, as contemplated by *Terry v. Ohio*, 392 U.S. 1 (1968), which was not based on reasonable suspicion. *Id.* at 3.  The Government responded in opposition, arguing that officers had reasonable suspicion for the stop.  *See* doc. 29 at 9-12.  The Government subsequently challenged Golden's standing to challenge the search of the bag and argued that, even if he had standing, he abandoned the bag.  *See* doc. 39 at 2-4; *see generally* doc. 43.

At the hearing and in their supplemental briefing, the parties developed their arguments concerning the Fourth Amendment implications of the circumstances of Golden's arrest.  First, while the parties agree that the initial interaction between Golden and the officers was a *Terry* stop, they dispute whether officers had sufficient

reasonable suspicion to justify that stop. *See, e.g.,* doc. 39 at 4-6. Second, assuming that the stop was justified, the parties dispute whether Golden has any expectation of privacy in a bag that was seized after he attempted to flee the stop. *See* doc. 39 at 2-4; doc. 43 at 3-8. Finally, assuming that he had a sufficient Fourth Amendment interest in that bag, the parties dispute whether its warrantless search was justified. *See* doc. 43 at 8-9. As discussed below, the Court should conclude that: (1) the initial stop was based upon reasonable suspicion; (2) Golden has not established that he had any reasonable expectation of privacy in the bag searched; and (3) the Government has proven that, even if Golden did have a reasonable expectation of privacy in the bag, he abandoned it. For any one of those independently sufficient reasons, therefore, the Motion to Suppress should be **DENIED**. Doc. 24. If the Court concludes that Golden lacked or abandoned any interest he had in the bag, it should decline to rule on whether the warrantless search was otherwise justified.

Interactions between law enforcement and citizens generally fall into three categories: "(1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny;

(2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (internal citations omitted). Interactions of the second type require "reasonable suspicion," as articulated in *Terry*, and allow law enforcement to briefly detain, for investigative purposes, an individual that they reasonably suspect to be engaged in a criminal activity. *See United States v. Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."). Reasonable suspicion is a lower standard than probable cause, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); "requir[ing] that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the person engaged in unlawful conduct." *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995).

The Government does not dispute that Golden was detained as soon as officers stopped him, asked him to turn around, and took hold of his hands. *See* doc. 29 at 9-12. Whether that detention, prior to the point when Golden attempted to flee, violated his Fourth Amendment rights depends upon whether officers had reasonable suspicion. The Government asserts that the officers had received notification of a forgery in progress. *See* doc. 29 at 12. A printout of the electronic report the officers received shows a report of "FORGERY-INPROGRE," and includes in a "comment," "IN REF TO BLK MALE WEARING LIGHT T SHIRT DARK SHORT AND BACKPACK ...ADVISED MALE SUBJ WHO GAVE THE FAKE 50 DOLLARS IS INSIDE THE STORE." Doc. 35-3 at 1. The printout also indicates "Name: AMY." *Id.* Officer Johnson explained at the hearing that he was able to view those notations in his vehicle before arriving at the location.

As Defendant's brief points out, the justification for a *Terry* stop based on a complaint or report, as opposed to the officer's own observation, is subject to specific analysis. *See* doc. 24 at 3-4 (citing *United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007)). The Supreme Court has distinguished between anonymous tips and "tip[s] from a

known informant." *See Florida v. J.L.*, 529 U.S. 266, 270 (2000). The Court has also "assumed that the unverified tip from [a] known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop." *Alabama v. White*, 496 U.S. 325, 330 (1990). "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* In *J.L.*, the Court explained that, for anonymous tipsters, "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." 529 U.S. at 272.

Defendant argues that the reports that Officer Johnson relied on in this case are tantamount to anonymous tips. Doc. 24 at 4-5. Defendant does not dispute that there is some identifying information associated with the tip. The caller listed in the report provided her name as "Amy," her location, and a phone number. *See* doc. 35-3 at 1. Despite that information, he points, *see* doc. 24 at 4, to Judge Barkett's observation in her dissent in *Lindsey* that "[g]iving . . . a name does not transform a tipster into a *known* informant . . . ." *Lindsey*, 482 F.3d at

7

1296 (Barkett, J. dissenting) (quoting *J.L.*, 529 U.S. at 270) (internal quotation marks omitted). Judge Barkett's concerns in *Lindsey* are not perfectly analogous to the facts of this case, however. Her dissent points out that "[s]elf-identification by name alone is meaningless when no information is available to verify whether the self-identification is true or false." *Id.* Officer Johnson testified that he overlooked the name listed in the report and believed that the individual he encountered at the location was the informant. While there is evidence that his assumption concerning the reporting party's identity was mistaken, the mistake was a reasonable one. Moreover, although the report Johnson received indicated a "forgery *in progress*," the actual alleged forgery occurred the prior day. The video recordings clearly reflect, however, that the precise chronology of the alleged crime was only established after the stop had resolved. Johnson's belief that the alleged criminal activity was recent was, therefore, also reasonable.

"[R]easonable suspicion can rest on an officer's mistake of law or fact if such mistake is objectively reasonable." *United States v. Campbell*, 2015 WL 13927094, at *4 (M.D. Ga. Aug. 20, 2015) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990), as to mistakes of fact);

*see also, e.g., Heien v. North Carolina*, 574 U.S. 54, 61 (2014) ("We have recognized that searches and seizures based on mistakes of fact can be reasonable."). Given Officer Johnson's wholly credible testimony, the Court should find that he was operating under the misapprehension that the individual he encountered, and who responded to his question, was the source of the reported "forgery in progress." Given that reasonable mistake of fact, *Lindsey*'s anonymous tipster analysis is not the correct rubric to evaluate reasonable suspicion.

As this Court has explained, present reporting witnesses are not subject to the inherent skepticism applicable to wholly anonymous tipsters. *See United States v. Wehrle*, 2007 WL 521882, at *4 n. 5 (S.D. Ga. Feb. 14, 2007). *Wehrle* noted that "[o]ne of the [Supreme] Court's primary justifications for not allowing . . . uncorroborated, anonymous tips to [justify a Fourth Amendment intrusion] is that the anonymous informant cannot be held responsible if the information is determined to be fabricated." *Id.* (citation omitted). Reporting witnesses who "made themselves known . . . rather than hiding behind a veil of anonymity, thereby subject[ ] themselves to possible repercussions if their allegations were found to be false." *Id.*; *see also*, *United States v.*

*Brown*, 636 F. App'x 514, 518 (11th Cir. 2016) ("[W]e consider an officer's ability to locate an informant at a later date to be an indicator of reliability."). Even assuming that the individual who identified Golden was "anonymous," in the relevant sense, "[a] face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant." *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004); *see also United States v. Martinez*, 851 F. App'x 946, 948 (11th Cir. 2021) (recognizing a witness' "[d]emeanor counts for a lot," even though an officer's "face-to-face interaction with [the witness] was brief . . . .").

The Government points out that the witness' interaction with Officer Johnson provided additional indicia of credibility. Doc 29 at 12. The Government argues that the elliptical interaction between the witness and Johnson could reasonably have supported Johnson's belief in the witness' veracity. When Johnson entered the establishment and encountered the witness, he said only "Where is he?" The Government points out that the witness did not respond with even an instant of

confusion, but immediately directed Johnson to the individual immediately outside "in the bucket hat," *i.e.*, Golden. There was no confusion apparent in the witness' response or demeanor about the reason for Officer Johnson's presence or the target of his question. The witness was the proverbial dog that did not bark in the nighttime. *Cf. Thomas v. Pierce, Hamilton, & Stern, Inc.*, 967 F. Supp. 507, 508 n. 2 (N.D. Ga. 1997) ("In *Silver Blaze*, Sherlock Holmes deduces from a dog's failure to bark that it was the trainer who attempted to harm a valuable horse."). Officer Johnson, therefore, reasonably, if ultimately mistakenly, believed that the individual he confronted was the reporting party who witnessed the "forgery in progress," and identified indicia of his reliability.

Finally, Officer Johnson's observations of Golden when he arrived at the location are also relevant to his reasonable suspicion. Johnson testified that he observed that Golden seemed "evasive" in response to law enforcement's arrival. He also noted his impression that Golden matched the report's somewhat vague description of the perpetrator of the alleged "forgery." The video from Johnson's body-worn camera captured his warning to another officer that Golden was "gonna run."

11

The video also captured the fact that Golden was departing the location as the officers exited, apparently corroborating Johnson's observation of his attempt to avoid law enforcement. As the Supreme Court has recognized "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. Thus, Golden's behavior provided an additional basis to corroborate Johnson's suspicion.

While the Court acknowledges Defendant's argument that Officer Johnson might have done more to expressly corroborate the report of "forgery in progress," the totality of the circumstances, as Johnson reasonably, if mistakenly, understood them, provided reasonable suspicion sufficient to justify a brief investigatory stop. Officer Johnson received a report of a "forgery in progress," including a description of the alleged perpetrator's clothes. He arrived at the location and observed an individual generally matching the description and behaving "evasively" in response to the arrival of law enforcement. He encountered an individual at the location who appeared to be an employee and, based on the individual's apparent knowledge of why he was there, concluded he was the reporting witness. The witness more

12

specifically identified the previously-observed "evasive" individual. When Johnson exited to confront the individual, he, finally, observed that he was in the process of leaving, apparently in response to law enforcement's arrival. The totality of those circumstances provided Officer Johnson with reasonable suspicion to justify a brief investigatory detention. To the extent that Golden's Motion asserts that the stop was not justified by reasonable suspicion, it should be **DENIED**. *See* doc. 24 at 9. Since the Court should conclude that the initial *Terry* stop was based on reasonable suspicion, as the Government points out, Golden's attempt to flee that stop provided probable cause to arrest him for misdemeanor obstruction. *See* doc. 43 at 8 (citing O.C.G.A. § 16-10-24.). In the absence of any unlawful seizure, Defendant's argument that the search of the bag, and discovery of the gun, were "fruit of the poisonous tree," *see* doc. 39 at 4-6, fails.

After Golden was arrested officers searched a backpack and discovered a firearm. At the hearing, the Government argued that, regardless of any Fourth Amendment violation in Golden's seizure, he

lacked "standing" to challenge the eventual search of the backpack.[2] Defendant has supplemented his Motion to Suppress to assert that he does have "standing" to challenge the search of the bag. *See* doc. 39 at 2-4. The Government responded. Doc. 43 at 3-8. Because the Court agrees with the Government that Golden has not established his standing to challenge any search of the bag and, to the extent he asserts standing, he abandoned it, any argument that the firearm discovered in that search should be suppressed should be **DENIED**.

"In order to have evidence suppressed based on a violation of the Fourth Amendment, a claimant has the burden of proving . . . that the claimant had a legitimate expectation of privacy." *United States v. McKennon*, 814 F.2d 1539, 1542 (11th Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)). To make the required showing, the

---

[2] Courts have come to refer to a party's required Fourth Amendment interest in the subject of a search as "Fourth Amendment standing." *See, e.g., Byrd v. United States*, 584 U.S. 395, 410-11 (2018). As the Supreme Court has explained, "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search . . . ." *Id.* at 410. However, it has cautioned that the concept "should not be confused with Article III standing, which is jurisdictional and must be addressed before reaching the merits" of a dispute. *Id.* at 410-11 (citation omitted). "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.* at 411.

individual must demonstrate a "subjective expectation of privacy in the object of the challenged search," and that "society [is] willing to recognize that expectation as legitimate." *Id.* at 1542-43. "[A]n individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020). The defendant challenging the evidence bears the burden of showing that he has "standing." *See, e.g., United States v. Padilla*, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated buy the challenged search or seizure.").

The parties agree that Golden possessed the backpack at issue when he first encountered the officers. Doc. 39 at 3; doc. 43 at 2. The Government points out, however, that Golden "fails to demonstrate anything beyond mere possession of the bag in question." Doc. 43 at 4. Golden's brief asserts, but does not point to any evidence to support, that he "clearly expected privacy in the bookbag." Doc. 39 at 3. He

15

points to the fact that, in the recording, police interviewed another individual at the scene who indicated that he loaned Golden the bag. *Id.* That individual disclaimed knowledge of what was in the bag. The ambiguous statements in the video, even if the Court drew all of the inferences Golden urges, do not establish his *subjective* expectation of privacy in the bag. *See* doc. 43 at 4-5. In the video exhibits Golden consistently states that the bag is not his. He repeatedly states that his bag is blue and white. Given that the only evidence in the record—as distinguished from counsel's assertions in the brief—supports that Golden expressed no subjective expectation of privacy in the bag, he has failed to establish his standing to challenge its search.

Although one statement of the subjective prong of the test for Fourth Amendment standing focuses on the "existence" of an expectation of privacy, other statements focus on the "manifestation" of such an expectation. *See, e.g., United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988) ("The first question," for Fourth Amendment standing, "asks whether the individual has manifested a subjective expectation of privacy in the object of the challenged search." (internal quotation marks and citation omitted)). "Manifestations" of a

defendant's subjective expectations, therefore, matter. In *McBean*, the court found that the defendant failed to establish his Fourth Amendment standing in a piece of luggage where, "when asked about the luggage, [defendant] stated without reservation and unequivocally that the luggage was not his . . . ." *Id.* at 1574. The Court expressly concluded that defendant's "disavowal precludes him from challenging the legality of the . . . search." *Id.* at 1575. *McBean* is not unique in holding that an express disclaimer of ownership of a piece of luggage is fatal to a defendant's Fourth Amendment challenge. *See, e.g., United States v. Maldonado-Espinosa*, 767 F. Supp 1176, 1192 (D.P.R. 1991) (collecting cases). *Cf. United States v. Lindsey*, 691 F. Supp. 3d 1370, 1378 (M.D. Fla. 2023) ("When someone unequivocally declares 'that's not my bag,' his statement suggests an intent to disclaim ownership and a possessory right to the item."). Finally, notwithstanding Golden's repeated and unequivocal disclaimers of the backpack, "[a] legitimate expectation of privacy must be proven by factors beyond mere possession . . . ," and, at most, the evidence of record establishes only Golden's possession. He has, therefore, failed to establish his Fourth Amendment standing to challenge the search of the backpack.

17

Finally, the Government argues that, even if Golden had established his standing to challenge the search of the bag, when he possessed it, Johnson's BWC recording establishes that Golden abandoned the bag. *See* doc. 43 at 5-8. In part, the Government's argument relies on Golden's disclaimers of ownership, which the Court has addressed above. *Id.* at 6-8. However, the Government also argues that Defendant's placing the bag on a table and then attempting to flee constitutes abandonment. Golden's brief does not address his purported abandonment and his counsel did not address the issue at the December 10 hearing. *See, e.g.,* doc. 39.

"[A] person lacks Fourth Amendment standing to challenge the search or seizure of property that he has voluntarily abandoned." *United States v. Gregg*, 771 F. App'x 983, 987 (11th Cir. 2019) (citation and quotation marks omitted). "To determine whether property has been abandoned, [courts] ask whether the individual voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.* (quotation marks omitted) (quoting *United States v. Ramos*, 12 F.3d

18

1019, 1022 (11th Cir. 1994)).  The Government bears the burden of establishing a defendant's abandonment of searched property, by a preponderance of the evidence, based upon defendant's "intent which may be inferred from acts, words, and other objective facts."  *Id.* (quotation marks omitted) (quoting *Ramos*, 12 F.3d at 1022-23); *see also, e.g., United States v. Rahmings*, 2024 WL 3594456, at *2 (11th Cir. July 31, 2024) ("The government bears the burden of proving abandonment." (citation omitted)).

The Court should find that, even if Golden had standing to challenge the search of the bag, the Government has proved by a preponderance of the evidence that he abandoned it.  The video recording shows that Golden placed the backpack on a table.  He then attempted to flee.  Although his flight was unsuccessful, he never made any attempt to retrieve the bag.  After he is apprehended, as discussed above, he loudly and repeatedly disclaims any ownership in the bag.  As the Sixth Circuit has noted, "when a person discards an item as part of an attempt to resist arrest, courts have repeatedly found that the person abandoned the item."  *United States v. Dillard*, 78 F. App'x 505, 511 (6th Cir. 2003); *see also, e.g., United States v. Rahmings*, 2023 WL

2765101, at *3 (M.D. Fla. Apr. 10, 2023) (defendant who "cast [his backpack] off . . . while running from police," abandoned it, and "[t]hat he was fleeing from arrest only enhances this conclusion, as his actions indicated an attempt to rid himself of incriminating evidence."); *United States v. Matthews*, 2020 WL 1539941, at *4 (N.D. Ga. Feb. 21, 2020) ("Courts repeatedly have held that when an individual flees from the police and in the process leaves behind an item . . . , he has abandoned any interest in the item for Fourth Amendment purposes," and collecting cases). Thus, the events depicted in the recording show, by a preponderance of the evidence, that Golden abandoned the backpack when he placed in on the table, attempted to flee, and then disclaimed his interest in it.

In summary, the Court should find multiple independently sufficient grounds to deny Golden's Motion to Suppress. Doc. 24. First, the Court should find that the *Terry* stop was based upon reasonable, if not ultimately accurate, suspicion. Second, the Court should find that Golden has failed to establish that he has standing to challenge the search of the backpack, notwithstanding that the BWC recording shows that he physically possessed it. Third, and finally, the Court should

find that the Government has proven by a preponderance of the evidence that Golden abandoned the backpack when he placed it on the table, attempted to flee, and then disclaimed any interest in it. Accordingly, the Motion to Suppress should be **DENIED**. Doc. 24.

## II.        Suppression of Statements (Doc. 23)

Golden moves to suppress statements he made after his arrest. *See generally* doc. 23. His initial motion stated that Defendant was taken "into custody," when officers placed him in handcuffs and then in the back of Johnson's vehicle. *Id.* at 3. After placing him in custody, "for several hours, multiple officers relayed various questions and spoke to Defendant at length." *Id.* He alleged that he never received the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966) during his detention. *Id.* The Government never disputes that Golden was never advised of his rights. *See generally* doc. 41. Defendant, therefore, asserted that "*all* of the Defendant's alleged statements . . . were obtained illegally," and should be suppressed. *Id.* (emphasis added). The Government objected that a full analysis of the application of *Miranda* and the voluntariness of Defendant's statements was not possible because his motion failed to specify which statements were

allegedly made in response to custodial interrogation or were otherwise involuntary.  Doc. 29 at 7-9.

At the October hearing, Defendant agreed to further specify the statements he challenged.  *See* doc. 35.  He did so, doc. 36, and the Government responded, doc. 41.  Although the Government noted that the response appeared to continue to seek suppression of unspecified statements, *see* doc. 41 at 3, Defendant clarified at the December 10 hearing that the statements specified in his supplemental briefing were the only statements he sought to suppress.  The Court, therefore, proceeds to consider whether the specified statements should be suppressed as involuntarily made.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444.  "Custody . . . has a specific meaning in the *Miranda* context, one that is different that the ordinary usage of the term."  *United States v. Woodson*, 30 F.4th 1295, 1303 (11th Cir. 2022).  "A person is 'in custody' for these purposes if he finds himself in circumstances that are thought

generally to present a serious danger of coercion." *Id.* (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)) (quotation marks omitted). "[T]hat coercive environment exists . . . when a reasonable person would have understood that his freedom of action was curtailed to a degree associated with formal arrest." *Id.* (internal quotation marks and citation omitted). Courts' evaluation of the coercion question proceeds in two steps. *Id.* "The first goes more to nature and the second more to degree." *Woodson*, 30 F.4th at 1303. The first inquiry asks whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (quotation and brackets omitted). The second inquiry considers "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* Coercive circumstances, including both aspects of the inquiry, are evaluated objectively; "the actual subjective beliefs of the defendant and . . . officer[s] on whether the defendant was free to leave are irrelevant." *Woodson*, 30 F.4th at 1304 (quotation marks and citation omitted) (citing, *inter alia*, *Stansbury v. California*, 511 U.S. 318, 323 (1994)). "Interrogation . . . means 'any words or actions on the

part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Gomez*, 927 F.2d 1530, 1538 (11th Cir. 1991) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).   The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, or that some exception to the *Miranda* rule applies.   *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Miranda*, 384 U.S. at 475; *United States v. Miller*, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005); *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991); *United States v. DeSumma*, 44 F. Supp. 2d 700, 703 (E.D. Pa 1999)).

Although the parties agree that Golden was "in custody," no later than when he was placed in Johnson's vehicle, they disagree about whether he was "in custody" prior to that point.   *See, e.g.,* doc. 41 at 5 ("[T]he Government argues that Defendant was not in custody until he was in the patrol car in handcuffs.").   Defendant argues that he was "in

custody" as soon as he was detained after his attempt to flee the initial investigatory stop. *See* doc. 36 at 2. The Government makes a somewhat perfunctory argument that Golden was not detained when he was physically restrained and placed in handcuffs before he was placed in Johnson's vehicle. *See* doc. 41 at 5.

However, the Government's contention that Golden was not "in custody" is undermined, at least somewhat, by the Government's suggestion, noted above, that he was, or could have been, arrested for obstruction. *See* doc. 43 at 8-9. Even though Golden was not told that he was under arrest during the disputed period, the officers' "unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time . . . ." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Thus, the fact that Golden was never free to leave after he was subdued and handcuffed is significant, even if it does not definitely resolve the question of his custody. *See id.* ("[T]he only relevant inquiry [to determine custodial status] is how a reasonable man in the suspect's position would have understood his situation."); *see also, e.g., Howes*, 565 U.S. at 509 ("[I]n order to determine how a suspect would have gauged his freedom of movement, courts must

25

examine all of the circumstances surrounding the interrogation." (internal quotation marks, alterations, and citation omitted).

Although the status of Golden's arrest is not dispositive, the Court is satisfied that the totality of the circumstances supports his contention that he was in custody during the period between his attempt to flee and his placement in Johnson's vehicle. Doc. 36 at 2. "Relevant factors [to evaluate custodial status] include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraint during the questioning, and the release of interviewee at the end of the questioning." *Howes*, 565 U.S. at 509 (internal citations omitted). Given the brevity of the disputed period, the factors are somewhat ambiguous. For example, "the location of the questioning," facially, might support the conclusion that Golden was not in custody, as he was on a public sidewalk. The duration, which amounts to less than a minute, also might support the conclusion that there was no custody between the initial seizure and Golden's confinement in officer Johnson's vehicle. However, Golden was restrained and he was not released at the conclusion of the disputed period. The Court is, therefore, satisfied that Golden's freedom of

movement "was curtailed to a degree associated with formal arrest." *Woodson*, 30 F.4th at 1303 (internal quotation marks and citations omitted).

As courts have recognized, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Woodson*, 30 F.4th at 1303. "[E]ven if [the court] conclude[s] that a reasonable person would not have felt at liberty to leave, [it] still must consider whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* (internal quotation marks and citation omitted). Defendant's brief does not address this second critical inquiry.[3] *See* doc. 36 at 2. However, neither does the Government. *See* doc. 41 at 3-4. As above, given the limited scope of the disputed period, the factors applicable to evaluate coercive pressure are not easily applicable to the instant facts. The fact that the officers outnumbered Golden and

---

[3] Given that it is Golden's burden to show that he was in custody, *see Woodson*, 30 F.4th at 1302 (citing *United States v. de la Fuente*, 548 F.2d 527, 533 (5th Cir. 1977)), his failure to address the second prong of the inquiry might be fatal. However, as discussed below, the Court follows the Government in its assumption, *arguendo*, that Golden was "in custody," during the entirety of the relevant period. Despite that assumption, as the discussion below indicates, the Court remains skeptical, to say the least, that Golden was "in custody," during the brief period between his seizure and his placement in Johnson's vehicle.

physically restrained him during the brief trip to Johnson's vehicle are relevant, but not dispositive. *See Woodson*, 30 F.4th at 1305-06. Other factors weigh against a coercion finding. The fact that the trip was public weighs against finding coercive pressure. *See id.* ("exposure to public view mitigates the risks that motivated *Miranda* . . ."). Moreover, Golden's access to his companion and later his child's mother, who he continued to communicate with, also weighs against coercion. *Id.* Finally, the exceeding brevity of the disputed period diminishes any coercive pressure. *Id.* at 1306-07. Given those countervailing factors, the Court is loath to find that there was any sufficient coercive pressure to trigger *Miranda* custody during the disputed period. However, given that the Government's opposition to suppression of the Golden's statements during the disputed period assumes *arguendo* that he was in custody, *see* doc. 41 at 6-7, the Court will assume, without deciding, that there was sufficient coercive pressure to trigger *Miranda* custody during that period.

Given the assumption that Golden was "in custody," for *Miranda* purposes throughout the period captured in the various video recordings, and the fact that he was never read *Miranda* warnings at

any point during the recorded events, whether any of Golden's statements are admissible depends upon whether they were the product of "interrogation." *See, e.g., Innis*, 446 U.S. at 299 ("This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation."). As the Supreme Court explained, " '[i]nterrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* It refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301. "A district court need not suppress spontaneous remarks which are not the product of 'interrogation.'" *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983). Defendant bears the burden of showing that his statements were the result of interrogation. *See, e.g., United States v. Peck*, 17 F. Supp. 3d 1345, 1354 (N.D. Ga. 2014) (noting that courts "have assigned the

burden of proof to the defendant seeking to challenge the admissibility of statements in the absence of a formal arrest," and collecting cases); *see also, e.g., Chaidez-Reyes*, 996 F. Supp. 2d at 1345 n. 23 ("[T]he defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.").

Rather than make an explicit argument identifying the "interrogation" that he was subjected to, Golden simply provides an informal transcript of portions of the Government's video exhibits, described as an "outline of questions," and asserts "all of [the questions contained in the outline] were reasonably likely to elicit an incriminating response." *See* doc. 36 at 4. The Government's response is equally elliptical. *See, e.g.,* doc. 41 at 8 (stating that "*few* police actions rise to the level of interrogation," and "[t]hose statements that the Government concedes [presumably, constitute interrogation] *include . . .*" several specific examples, and "conced[ing] that [a specific] question and answer section . . . *could be construed* as an interrogation." (emphasis added)). Given the quality of the briefing, then, the Court has considered the specific exchanges identified by Golden and

identified those that constitute interrogation. Although Defendant conceded at the December 10 hearing that his challenge was limited to the listed exchanges, for clarity, to the extent that his original Motion, doc. 23, sought to suppress any statements beyond those listed in his supplemental brief, doc. 36, it should be **DENIED, in part**. Doc. 23; *see also, e.g.,* doc. 36 at 4 ("Any additional statements made by Defendant, from this point [*i.e.* Johnson's initial question, "why did you do all that?"], whether unsolicited or not, cannot be considered voluntary or freely given because Defendant was not read Miranda."), 16 (asserting "all the statements of the Defendant after his arrest must be excluded."); doc. 41 at 3 (renewing objection to generalized *Miranda* challenge).

In the Government's Exhibit 1, Golden identifies Johnson's questions "Why are you acting crazy?" and "why did you do all that?" as questions constituting "interrogation." *See* doc. 36 at 4. The Government's only response is to argue that "an officer following up on the suspect's volunteered information does not 'convert the interaction into an interrogation.'" Doc. 41 at 7 (quoting *United States v. Young*, 2024 WL 3760514, at *11 (N.D. Ga. June 5, 2024)). The questions

identified are clearly not "following up" on any statement Golden volunteered. *See, e.g.,* doc. 36 at 4. Moreover, in the context of Golden's detention and possible arrest for obstruction, the questions were clearly questions that an officer should know were reasonably likely to elicit an incriminating response. Accordingly, to the extent that Golden seeks to suppress the statements he made in response to those questions, his Motion should be **GRANTED, in part**. Doc. 23, in part; *see also* doc. 36 at 4.

Golden has not borne his burden to show that his statements, "I didn't spend a dime here. I just came up here," and "That's not my bag," were the result of interrogation. *See* doc. 36 at 5. Those statements appear to be wholly spontaneous. *See, e.g., Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused, even after *Miranda*, rights are asserted, are admissible evidence if the comments were not made in response to government questioning."); *United States v. Pulido-Tejedo*, 2007 WL 1812654, *4 (S.D. Ga. June 18, 2007) ("The protections of *Miranda*, . . . , do not extend to spontaneous, unprompted statements made to law enforcement officers after a suspect has been taken into

custody." (citations omitted)).  As such, to the extent that he moves to suppress them, his Motion should be **DENIED, in part**.  Doc. 23, in part.  Moreover, given his spontaneous statement disclaiming ownership of the bag, to the extent that Johnson's response, "Isn't this the bag you, he," could be construed as a follow-up question, the Court also concludes that Defendant has not borne his burden to show that it constituted "interrogation." *See, e.g., United States v. Villegas-Tello*, 319 F. App'x 871, 875-76 (11th Cir. 2009) ("While we have yet to address whether a police officer's follow-up questions, asked for the sake of clarification, to a defendant's spontaneous statements implicate *Miranda*, several of our sister circuits have held that *Miranda* also does not reach this situation," and collecting cases).  Accordingly, to the extent that Golden's Motion seeks to suppress his statements as a response to that prompt, his Motion should be **DENIED, in part**.  Doc. 23, in part.

None of Johnson's identified contributions to the specified conversion even plausibly constitute "interrogation" until he states: "All we are talking about is why we came here."  Doc. 36 at 6.  Although an officer's suggestion that a suspect talk about the reason for law

enforcement presence may be one an officer should know is reasonably likely to elicit an incriminating response, Golden does not appear to respond to it. *See id.* (reporting Golden's response as: "That sh\*\* crazy," and ". . . have a problem with everything, all right?"). Since Golden has not borne his burden to show that those statements, whatever they might mean, were the result of "interrogation," to the extent his Motion seeks to suppress them, it should be **DENIED, in part**. Doc. 23, in part.

Golden then asks Johnson whether he can "get [his] blue wrap bag?" and states "I got a blue wrap bag." Doc. 36 at 6. In response to that question and statement, Johnson again asks "Is that your bag right there? Your boy got on his back?" Again, those questions plausibly constitute interrogation, but because they are merely follow-up questions to Golden's spontaneous question and statement, they do not implicate *Miranda*. *See Villegas-Tello*, 319 F. App'x at 875-76. Accordingly, to the extent that Golden's Motion seeks to suppress those statements, it should be **DENIED, in part**. Doc. 23, in part; *see also* doc. 36 at 6.

Golden next identifies an exchange commencing with Johnson's statement that Golden had the bag in his possession.  Doc. 36 at 7. Golden makes a vague statement apparently disclaiming the bag, and Johnson asks, "So whose bag was it, man?"  *Id.*  After Golden does not substantively respond, Johnson repeats "Who bag is it, bro?"  *Id.*  Those questions are clearly interrogation, and they are not clearly following up on any statements Golden makes.[4]  The following exchange appears to be a continuation of Golden's response to those questions.  *Id.* at 7-8. Further, Johnson's statement "Nah, man, y'all can't use fake money, bro," *id.* at 7, is one that an officer should know was reasonably likely to elicit an incriminating response.  *See, e.g., United States v. Perez*, 948 F. Supp. 1191, 1198 (S.D.N.Y. 1996) (noting that "[s]everal courts in this District and elsewhere have held that confronting a suspect with a belief in his guilt is the functional equivalent of interrogation," and collecting cases).  Accordingly, to the extent that Golden's Motion seeks

---

[4] To be sure, Golden's ambiguous statement may have introduced the subject of the bag and its ownership.  However, Golden's somewhat inarticulate statement, to the extent that it is coherent, disclaiming the bag, and stating that his bag was blue and white, does not necessitate a follow-up question to determine whether Golden knows to whom the black bag belongs.  As distinguished from the prior exchange, when Golden asked for "his bag," discussed above, where it was a reasonable follow-up question to ask whether a particular bag was the one he was asking for.

to suppress all of his statements following Johnson's questions, it should be **GRANTED, in part**. Doc. 23; *see also* doc. 36 at 7-8.

Golden next challenges statements recorded in the Government's Exhibit 2. *See* doc. 36 at 8-11. The challenged exchange begins with a question from an Officer Dismuke: "You sure your ID in the bag, or probably something else?" *Id.* at 8. While it is not obvious that such a question could not constitute *Miranda* interrogation, Defendant has not borne his burden to show that it does. For example, the United States Court of Appeals for the Sixth Circuit has held that an officer's asking a suspect what was in the suspect's pocket was not interrogation because it was "normally attendant to arrest and custody." *United States v. Woods*, 711 F.3d 737, 740-41 (6th Cir. 2013) (quoting *Innis*, 446 U.S. at 301)). The same court later noted that such questions may also avoid *Miranda* under the "public safety" exception, which permits "questions necessary to secure their own safety or the safety of the public." *United States v. Lester*, 98 F.4th 768, 774-75 (6th Cir. 2024) (citing *New York v. Quarles*, 467 U.S. 649 (1984)). Thus, under at least some circumstances, such a question would not violate *Miranda*. In the absence of a more thorough argument, Golden has not borne his burden

to show his statements were the result of interrogation.  Accordingly, to the extent that his Motion seeks to suppress statements in response to that question, it should be **DENIED, in part**.  Doc. 23, in part.

After a brief exchange, Officer Dismuke says: "All that talking, you should have done that when we got you.  Why you didn't do it then?  You know how to run though[ ] right?"  Doc. 36 at 8.  As above, in the context of Golden's possible arrest for obstruction, the questions about why he ran could reasonably be expected to elicit an incriminating response.  Similarly, Dismuke's subsequent reference to Golden's flight: "First thing you wanna do it try to take off running," *id.* at 9, could reasonably be expected to elicit an incriminating response as well.  Therefore, to the extent that Golden seeks to suppress his responsive statements, his Motion should be **GRANTED, in part**.  Doc. 23; *see also* doc. 36 at 8-9.  The Government concedes that Johnson's question "Where the, where the fifty dollar bill at?" and Dismuke's statement "You got a gun, though," and his questions "That's why you running?  Because we go a gun right here?" and "Yeah, so the gun, the gun don't belong to you, either?" constitute interrogation.  *See* doc. 41 at 8-10.  Finally, Dismuke's reference to "the whole reason why you ran.  Well,

37

try to run," *id.* at 10, could reasonably be expected to elicit an incriminating response. To the extent that Golden seeks to suppress his responses in that conversion, therefore, his Motion should be **GRANTED, in part**. Doc. 23, in part; *see also* doc. 36 at 8-10.

Golden next challenges an exchange also recorded in the Defendant's Exhibit 2 between him and an officer identified as Officer Bloth. *See* doc. 36 at 11-15. In Golden's summary, Bloth introduces himself to Golden and immediately asks Golden to "tell [him] what happened?" *Id.* at 11. While, as discussed in more detail below, the Government makes some general assertions about the character of the exchange, an open-ended question like the one Bloth put to Golden is clearly one that could reasonably be expected to elicit an incriminating response. *See, e.g., United States v. Thomas*, 2012 WL 6812536, at *5 (D. Minn. Dec. 19, 2012) (" 'Express questioning' qualifies as interrogation for purposes of *Miranda*," and holding that officer's question "what happened?" was "not like routine booking questions," but "reasonably likely to elicit an incriminating response" (citing *Innis*, 446 U.S. at 301)). Golden then provides a narrative of his movements prior to his encounter with the officers. *See* doc. 36 at 11-12. Since all

38

of Golden's statements were responsive to Bloth's initial question, to the extent that his Motion seeks to suppress them, it should be **GRANTED, in part**. Doc. 23, in part; *see also* doc. 36 at 11-12. The same analysis applies to the exchange that follows Bloth's asking "All right, so what happened with the officers?" *see* doc. 36 at 13, and "So, the officers . . . When the officers said you were detained, then what?" *id.* at 14, and "Okay, so then what happened after they tried to . . ." *id.* To the extent that Golden's Motion seeks to suppress those exchanges, it should be **GRANTED, in part**. Doc. 23, in part.

The Court agrees with the Government, *see* doc. 41 at 8-9, that the exchange between Bloth and Golden concerning Golden's identification arose from a routine administrative question. *See, e.g., Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990) (responses to questions including "name, address, height, weight, eye color, date of birth, and current age," were admissible, despite being "interrogation," as they were "within a 'routine booking question' exception"). To the extent that Golden's Motion seeks to suppress those statements, which amount to no more than his name and "GD number," it should be **DENIED, in part**. Doc. 23, in part. The Court also agrees with the Government

that Golden has not borne his burden to show that his statement: "Man, they got my bag. My gun in there, bro," doc. 36 at 14, was made in response to interrogation. *See* doc. 41 at 9. It appears in the video recording that Golden is speaking to someone behind and to Bloth's left. Bloth's response, instructing Golden to "talk to me," also indicates that his statement was not directed to Bloth or made in response to any of Bloth's questions. To the extent that Golden's Motion seeks to suppress that statement, it should be **DENIED, in part**. Doc. 23, in part.

In its response, the Government makes several comments that merit brief discussion. *See* doc. 41 at 8-9. First, the Government contends, albeit implicitly, that the fact that Bloth's intent was "to ensure that Defendant was alright after the use of force and get any information Defendant wished to provide for that," alters the interrogation analysis. *See* doc. 41 at 8. Since "[t]he subjective belief or intent of officers is not determinative of whether an interrogation occurred," *United States v. McRae*, 2020 WL 1891749, at *4 (S.D. Ga. Jan. 23, 2020) (citing *Innis*, 446 U.S. at 301), that contention is meritless. *See also, e.g., United States v. Arellano-Banuelos*, 912 F.3d 862, 866 (5th Cir. 2019) ("Although an officer's subjective intent may be

40

relevant to what an officer *should* know, proof of subjective intent is not required to establish that an interrogation occurred." (citing *Innis*, 446 U.S. at 301, 301 n. 7)).  Second, it is unclear how the Government's assertion that some of the questions were "meant to determine what happened to the officers," relates to the interrogation analysis. However, perhaps quite frequently, questions "meant to determine what happened to the officers" could reasonably be expected to elicit an incriminating response.  Finally, the Government points out that Bloth "makes a number of declarative statements and Defendant continues to talk . . . after these statements."  Doc. 41 at 9.  Again, the import of the Government's assertion is entirely unclear.  First, it is unclear to which "declarative statements" the Government refers.  Bloth says "Okay," or an equivalent expression, several times, apparently prompting Golden to continue his narrative response to a prior question, *see, e.g.,* doc. 36 at 11, he makes a comment about his age and appearance, *id.* at 14.  He makes several statements at the conclusion of the challenged exchange: "I don't have a camera in there[,]" and "Well, I wasn't here, so I don't know."  *Id.* at 15.  However, those statements appear to be part of a conversation constituting Golden's response to his question "so then

what happened after they tried to . . . ." *Id.* at 14. Since, as discussed above, that question could reasonably have been expected to elicit an incriminating response, the fact that the subsequent exchange included some "declarative statements" does not alter the admissibility of Golden's statements.

Finally, Golden challenges an exchange, recorded in Defendant's Exhibit 3, between himself and Johnson that occurred sometime after Golden's arrest while they are waiting at what appears to be a hospital. *See* doc. 36 at 15-16. The Government asserts that, in that exchange, "there are not any questions from [Johnson] that a reasonable person would see as eliciting incriminating statements." Doc. 41 at 9. Although the Court has already noted the difficulties created by the parties' approach to this dispute, those difficulties are particularly acute in analyzing this exchange. On the one hand, the Defendant's apparent argument that at least some of Johnson's statements in the exchange are the "functional equivalent" of interrogation, *see, e.g.,* doc. 36 at 15 (presenting Johnson's statements about "confusion on the dispatches part"), is not implausible. *See, e.g., Innis*, 446 U.S. at 301 (*Miranda* interrogation extends to "express questioning, *but also any*

*words or actions* on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."). Officer Johnson's musings about "a line of confusion on the dispatches part," could rise to the level of the functional equivalent of interrogation, but Golden does not make that argument. *See* doc. 36 at 16. On the other hand, the Government's assertion that Johnson appears to attempt to avoid discussing anything that could be incriminating, *see id.* at 15-16 (Johnson stating he would "rather not" talk about anything "incriminating," but suggested he and Golden "keep talking about life."), is also not implausible. Ultimately, because it is Golden's burden to identify the *Miranda* interrogation, and he has not done so, his Motion to suppress the identified exchange should be **DENIED, in part**. Doc. 23, in part; *see also* doc. 36 at 15-16.

Even though the Court concludes, as specified above, that certain statements should not be suppressed as *Miranda* violations, that conclusion is not dispositive of their voluntariness. As the Supreme Court has explained, "[i]t is . . . axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession . . . ." *Jackson v.*

*Denno*, 378 U.S. 368, 376 (1964) (citation omitted).  Courts "focus [the] voluntariness inquiry on whether the defendant was coerced by the government into making the statement:  The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice, rather than intimidation, coercion or deception." *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005) (internal citation and quotations omitted).  Although voluntariness depends upon the totality of the circumstances, "[a]bsent police conduct causally related to the confession, there is no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 1296 (quoting *Connelly*, 479 U.S. at 164) (internal quotation marks and alterations omitted).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Id.* (internal quotation marks and citation omitted).

Neither Defendant's original Motion nor his supplement makes any argument that, notwithstanding the alleged *Miranda* violations, the statements were involuntary, within the meaning of *Jackson*.  *See*

44

*generally* docs. 23 & 36. The Government's responses are similarly silent. *See generally* docs. 29 & 41. In the absence of any allegation of involuntariness, argument, or indication of any coercive conduct in the video recordings, *i.e.* "exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that indices a confession," *Thompson*, 422 F.3d at 1296, the Court should find that all of those statements that were not the result of *Miranda* violations were voluntarily made.

## III.     Prior Act Evidence (Doc. 27)

The Government's original notice, pursuant to Federal Rule of Evidence 404(b), stated its intent to introduce evidence concerning six of Defendant's prior convictions, dating from 2012 to 2021. *See* doc. 25 at 1-2. The Government argued that all of the prior convictions "involve Defendant knowingly possessing firearms . . . [and so] are relevant among other things to establish that Defendant's later possession of a firearm in the instant case was not the product of an accident or mistake, but a knowing violation of the law." *Id.* at 4. Defendant

objected to the Notice, seeking to "suppress"[5] introduction of the prior convictions. *See generally* doc. 27. The Court ordered supplemental briefing because the Government indicated at the hearing that, despite its Notice, it did not intend to introduce all of the prior convictions. *See, e.g.,* doc. 40 at 3. The Government's post-hearing briefing indicates that it only intends to admit Golden's 2012 convictions for robbery and aggravated assault. *Id.* Defendant has objected to the more limited notice. *See* doc. 42. For the reasons explained below, his objection, construed as a motion *in limine*, is **DENIED**. Docs. 27 & 42.

Courts in this Circuit, generally, apply a three-part test to determine admissibility under Rule 404(b). *See United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992). "Uncharged crimes, wrongs, or acts may be admissible either as intrinsic or extrinsic evidence, provided evidence of the conduct meets certain criteria." *United States v. White*, 848 F. App'x 830, 839-40 (11th Cir. 2021). Pursuant to Federal Rule of Evidence 404(b), such acts are "not admissible to prove a person's character in order to show that on a particular occasion the

---

[5] This Court considers motions seeking to exclude evidence of prior conduct pursuant to Rule 404(b) as motions *in limine*, not motions to suppress. *Cf. United States v. McMillar*, 2024 WL 1337889, at *3 (S.D. Ga. Mar. 28, 2024) (construing opposition to the Government's 404(b) notice as a motion *in limine*).

person acted in accordance with the character," but may be admissible to prove, for example, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2). Once a proper purpose for the evidence is identified, it is subject to the familiar balancing test required by Rule 403. *See, e.g.,* Fed. R. Evid. 403; *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013) ("All admissible evidence [under Rule 404], whether intrinsic or extrinsic, must be weighed against Rule 403 prejudice." (citation omitted)). Finally, in addition to the purpose criterion and Rule 403 balancing, "as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act." *Miller*, 959 F.2d at 1538 (citing, *inter alia*, *Huddleston v. United States*, 485 U.S. 681, 689 (1988)).

Golden disputes whether the Government has identified a permissible purpose for introducing the prior convictions and, if it has, that the prejudice of their admission outweighs their probative value.[6]

---

[6] Golden does not challenge that there is sufficient proof that he committed the prior acts. The convictions are clearly sufficient to satisfy the Government's burden. *See, e.g., United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997) ("It is elementary that a conviction is sufficient proof that [the defendant] committed the prior act.")).

*See generally* doc. 42. Defendant points to the dissimilarity between the conduct at issue in the prior convictions, *i.e.*, assault and robbery, and the firearm possession at issue in this case. *See id.* at 3-4. He cites to out-of-circuit authority in support of his contention that a defendant's not guilty plea to unlawful possession of a firearm, "does not automatically bring knowing or intent into issue." *Id.* at 4 (citing *United States v. Steele*, 216 F. Supp. 3d 317 (S.D.N.Y. 2016)). However, as the Government points out, doc. 40 at 5-6, the Eleventh Circuit has "held that a prior conviction in which the defendant possessed a gun provides a logical connection between a convicted felon's knowing possession of a firearm at one time and his knowledge that a firearm is present at a subsequent time (or, put differently, that his possession at the subsequent time is not mistaken or accidental)." *United States v. Vails*, 2023 WL 4505251, at *2 (11th Cir. July 13, 2023) (citing *United States v. Jernigan*, 341 F.3d 1273, 1281 (11th Cir. 2003), *abrogated, in part, on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019)). The Government, therefore, has identified a permissible purpose for admission of the prior convictions.

In considering Golden's argument that risk of prejudice from admission of the prior convictions outweighs their probative value, *see* doc. 42 at 5-6, the Court is mindful that "because it permits a trial court to exclude concededly probative evidence, Rule 403 is an extraordinary remedy which should be used sparingly." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (internal quotation marks and citations omitted). Evidence in a criminal case is often inherently prejudicial to a defendant, but "it is only when *unfair* prejudice *substantially* outweighs probative value that the rule permits exclusion." *Id.* Defendant, as the moving party, "has the burden of proving that the evidence sought to be excluded is inadmissible." *United States v. Oury*, 568 F. Supp. 3d 1380, 1385 (S.D. Ga. 2021) (internal quotation marks and citation omitted).

Defendant identifies two sources of prejudice. *See* doc. 42 at 5. First, he argues that, as propensity evidence, admission of evidence of the prior convictions would be inherently prejudicial. *See id.* (citing *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013)). Since the Court finds, above, that the Government has identified a non-propensity purpose for introduction of the prior convictions, Defendant's argument does not identify any preclusive prejudice. Defendant's

49

second argument is that the prior convictions are cumulative, given the strength of the Government's other evidence. *See id.* (pointing to "multiple body-worn camera videos and a DNA test"). While Defendant's argument has some merit, the Court is not convinced that it is sufficient to justify the "extraordinary remedy" of exclusion. To the extent that the prior convictions show intent, knowledge, or absence of accident or mistake, it is simply not clear that they are cumulative, much less that any cumulative character substantially outweighs the probative value.

As the Government points out, doc. 40 at 5, "Rule 404(b) is a rule of inclusion . . . ," *United States v. Harding*, 104 F.4th 1291, 1300 (11th Cir. 2024). The Court accepts that the Government has identified a permissible purpose, other than propensity, to admit the evidence of the prior convictions. While it does not completely discount Defendant's arguments concerning the evidence's limited probative value and the risk of prejudice it may pose, the limiting instruction required when the evidence is admitted should reduce any risk of prejudice. *See, e.g., id.* 1301 ("[W]hen a district court admits extrinsic evidence under Rule 404(b), the district court *must* provide a limiting instruction." (internal

quotation marks and citation omitted) (emphasis in original)). Defendant's Motion to exclude evidence of the two prior convictions identified in the Government's post-hearing brief, doc. 40 at 3, is **DENIED**. Doc. 27, in part. Defendant's Motion is **DISMISSED as moot**, to the extent that it seeks to exclude the remaining four prior convictions contained in the Government's original Notice. Doc. 27, in part; *see also* doc. 25 at 1-2.

## IV.    Conclusion

In summary, Defendant's Motion to Suppress his statements should be **GRANTED, in part**, and **DENIED, in part**, as specified in Section II above. Doc. 23. His Motion to Suppress physical evidence discovered after his seizure and arrest should be **DENIED**. Doc. 24. Finally, his Motion challenging the admissibility of prior convictions, pursuant to Federal Rule of Evidence 404(b), construed as a motion *in limine*, is **DENIED, in part**, and **DISMISSED as moot**, in part. Doc. 27.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of

service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED REPORTED AND RECOMMENDED,** this 10th day of January, 2025.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

52